## BUTLER and others *vs.* LIVERMORE and others.

Since the Code, the action formerly styled *indebitatus assumpsit*, lies to recover back money obtained or paid by actionable deceit, or false and fraudulent representations.

And *it seems*, notwithstanding this remedy at law, the defrauded party may resort to a court of equity and recover his money back.

An action cannot be maintained, either at law or in equity, against parties as sellers of stock, to recover back the price paid by the plaintiffs therefor, as stock of the defendants, for their use, on the ground of false and fraudulent representations alleged to have been made by the defendants; where it appears that when the plaintiffs agreed to take the stock, they knew, or, at least, supposed and believed, they were dealing with the defendants as the agents of third parties to obtain *subscriptions* for stock in a new company, and did not suppose they were *purchasing*, or agreeing to purchase, stock of the defendants, but supposed they were paying the money to them for the use of their principals; and it also appears that where the defendants were, in fact, such agents, and the plaintiffs' money was paid to, and received by them, not as sellers of the shares, but as subscription agents, for the use and benefit of their principals; and had been paid over to the latter, before suit brought, without notice or objection.

Such an action must be regarded as an action on contract, and not as an action for a tort. It must be deemed an action to recover back the money paid, as so much money had and received by the defendants to and for the use of the plaintiffs, with interest, and not an action to recover damages for the alleged false and fraudulent representations, or for deceit.

And should it be sent to the circuit for trial, it could not be tried there as an action to recover damages for obtaining the plaintiffs' money for the use of the defendants' principals, or of the corporation, by means of the alleged false and fraudulent representations. And as the court cannot, on a trial at special term, without a jury, render a judgment against the agents for the money which they received of the plaintiffs, they having paid it over to their principals, the complaint will be dismissed.

ACTION to recover back the sum of $45,000, the price of certain shares of stock in a gold company, which the plaintiffs allege they were induced by certain false and fraudulent representations of the defendants, set forth in the complaint, to buy of them; the plaintiffs offering to return and transfer the stock to the defendants. The action was tried at special term before the court, without a jury.

*Wm. E. Curtis,* and *Samuel A. Foot,* for the plaintiffs.

*Wm. F. Allen* and *Foster & Thompson,* for the defendants.

SUTHERLAND, J. Before the Code, *indebitatus assumpsit* would lie to recover back money obtained or paid by actionable deceit, or false and fraudulent misrepresentations.

Since the Code, so far as it may be proper to call or classify actions by names, it has been and is proper to say, that *indebitatus assumpsit* lies to recover back money thus obtained or paid.

And it seems, notwithstanding this remedy at law, the defrauded party might resort to a court of equity and recover his money back. (*Cott* v. *Woollaston,* 2 *P. Williams,* 154. *Green* v. *Barrett,* 1 *Simons,* 45. *Blain* v. *Ager,* 2 *Id.* 205.)

The court of chancery, probably from the first, claimed jurisdiction in all cases of fraud, and it was held that the subsequent use of the action of *indebitatus assumpsit* in courts of law, did not take away from the court of chancery its jurisdiction. (*See cases above cited, and Sailly* v. *Elmore,* 2 *Paige,* 499 ; *Eyre* v. *Everett,* 2 *Russell,* 382.)

But it seems that a bill in equity could not be sustained, merely for the purpose of obtaining a compensation for a fraud, in damages, to be paid by the defendant personally, where the defendant took the objection at the proper time, by demurrer or answer, that the complainant had a full and perfect remedy at law. (*Bradley* v. *Bosley,* 1 *Barb. Ch.* 125. *Shepard* v. *Sanford,* 3 *id.* 127; *and see Crane* v. *Bunnell,* 10 *Paige,* 333.)

The Code, (§ 69,) undertook to abolish the distinction between actions at law, and suits in equity, and the forms of all actions, theretofore existing, and probably succeeded, so far as it could be done by mere words ; but the Code could not and did not undertake to abolish the distinction

between causes of action—the distinction between torts and assumpsits.

The Code recognizes the distinction between circuits and special terms, between trials by jury, and trials by court; and section 253 declares that an issue of fact in an action for the recovery of money only, must be tried by a jury, unless a jury trial be waived, or a reference be ordered, as provided in certain other sections of the Code.

The case made by the complaint in this action concisely stated, must be regarded as this: The plaintiffs were induced by certain false and fraudulent representations made by the defendants, set out in the complaint, *to buy of the defendants,* certain shares of stock in the Bates & Baxter Gold Company, and to pay *them* therefor forty five thousand dollars. The plaintiffs, offering to return and transfer the stock *to the defendants,* ask a judgment for the forty-five thousand dollars, with interest. Though the complaint alleges that the defendants pretended that they would have to go out, and purchase the stock of a third party, and that the plaintiffs authorized them to do so; yet it subsequently alleges that the stock which was transferred to the plaintiffs, or one of them, by the defendants, was owned by them, at the time of the contract of purchase, and subsequently up to the time of the transfer.

It is plain, looking at the complaint merely, that the action must be regarded as an action on contract, and not as an action for a tort; that it must be regarded as an action to recover back the money paid, as so much money had and received by the *defendants,* to and for the use of the plaintiffs, with interest, and that it cannot be regarded as an action to recover damages for the alleged false and fraudulent representations or for deceit.

The answer of the defendants contains nothing but a general denial of each and every allegation in the complaint.

The action was tried at the special term, on the theory

Butler *v.* Livermore.

that it was an equitable action to recover back the money paid, with interest, the plaintiffs bringing into court and offering to return and transfer to *the defendants* certificates for the shares of stock, or for the same number of shares; and the defendants expressly claiming and insisting, that the action could not be regarded as an action to recover damages for the alleged fraud or fraudulent misrepresentations, and if it could or should be so regarded, that they were entitled to a trial by jury, and the action should be tried at the circuit.

Considerable evidence was offered and received at the trial, relating not only to the alleged fraudulent and false representations by the defendants, and to the question generally of the fraud or fraudulent intent of the defendants, but also, as to the questions, whether the transaction of the alleged *sale* and transfer of the defendants' stock, was in fact a *sale* and transfer of the *defendants' stock*, or was so viewed by the parties at the time, or could be so viewed by the court.

As to the last points, or questions, I think I may say, that the case made by the proofs, concisely stated, is this: The "Bates & Baxter Gold Company," was and is, a New York bubble corporation, got up by sixteen individuals, whom it is not necessary to name, and *formally* formed on the first day of April, 1864, by the filing of a certificate on that day, signed and acknowledged by three of them, under the act of 1848, authorizing the formation of corporations for "manufacturing, mining, mechanical and chemical purposes," and the act of June 7, 1853, amending the same.

The certificate states, that "the amount of the capital stock of the said company shall be fifty thousand shares, amounting at the nominal par to two millions five hundred thousand dollars," but that, "the said capital is not to be owned or possessed by it in money, but is to consist of, and to be represented by, the mines, mining interests,

and other property, necessary for the business of said company, *to be purchased by the trustees thereof, and to be paid for by the issue of the stock of the said company.*" It also states, that "the number of shares is to be fifty thousand, of the nominal par value of fifty dollars each." It also names seven of the sixteen individuals as trustees for the first year, and until others are elected in their places.

Not long before the formation of the corporation, probably in March previous, two of the sixteen individuals, having learned that one Bodfish had certain mining claims or interests in Colorado for sale, associated with them the other fourteen, and the sixteen associates agreed to purchase the mining claims or interests for about two hundred and thirty thousand dollars, and to get up or form a corporation; and the sixteen associates, previous to the formation of the corportion, advanced or paid to one of their number, as treasurer, three hundred and twenty thousand dollars, (most of the associates paying $20,000 each, but one paying only $5000, and another, or the firm of which he was a member, paying $30,000, to pay for the mining claims or interests, and for a working capital for the corporation ; $90,000, of the $320,000, being fixed and agreed upon, as the amount to be paid and reserved for the working capital of the corporation to be formed.

Upon, or immediately after, the technical formation of the corporation, by the filing of the certificate on the first day of April, 1864, but before its trustees had met, or it had a president, secretary or treasurer, or any property, or any stock had been issued or subscribed, the sixteen associates, or some of them, with the knowledge and approbation of the others, employed the defendants, who as co-partners were dealers in stocks and government securities, in Wall street, to dispose of twenty thousand shares of the nominal capital stock of the corporation, at the *scheme price* of $25 per share.

The twenty thousand shares were rapidly taken and dis-

posed of, at the *scheme* price; and the defendants paid over to one of the sixteen associates, acting as treasurer for all, about five hundred thousand dollars, as the proceeds, less defendants' commissions, of their disposition of the twenty thousand shares, at the *scheme* price, and he paid back to the sixteen associates the sums (in the aggregate, $320,000,) which they had severally advanced to pay for the mining claims or interests, and for the working capital of the corporation.

On the 7th of April, 1864, and after the twenty thousand shares had been taken or disposed of at the scheme price, the trustees named in the certificate of incorporation met, and elected á president, and a secretary and treasurer, and appointed a committee to draft by-laws, and passed a resolution, that the company purchase of Bodfish the mining claims or interests for the consideration of fifty thousand shares of the stock of the corporation, the entire capital stock, and that, on the approval of the title and execution of a deed, the president and secretary be authorized to issue to Bodfish, or his attorney, fifty thousand shares of the stock of the company. Thereafter, on the 25th of April, 1864, on the execution of an approved conveyance by Bodfish, the fifty thousand shares, the entire nominal capital stock of the corporation, were *formally* issued to him, and he, thereupon, on the same day, and probably immediately after they were so formally issued to him, formally transferred the fifty thousand shares, to three of the sixteen associates, and the three associates, on the same day, and probably immediately after the formal transfer to them, formally transferred the twenty thousand shares to the defendants, who from time to time thereafter transferred the twenty thousand shares to the parties to whom they had disposed of the twenty thousand shares at the *scheme* price, and the three associates to whom the fifty thousand shares had been transferred by Bodfish, after formally transferring the twenty thousand shares to the defendants,

from time to time, formally transferred and distributed the remaining thirty thousand shares to and among the sixteen associates, or to other parties by their order, and for their benefit; so that the result of the scheme was that the sixteen associates had and distributed among themselves, or had the benefit of, the thirty thousand shares, without paying one cent therefor.

And the evidence in this case obliges me to say, that this result was the attainment of the original purpose of the scheme of the sixteen associates; that the reorganization of the corporation and the subsequent proceedings under or in its name, were at least in fraud of the statutes under which the corporation was organized; that the issue of the fifty thousand shares of stock to Bodfish was a mere form, gone through with, with the understanding between the parties to the ceremony that Bodfish was to transfer the shares to the sixteen associates, or to some one or more of them, for the benefit of all; that the fifty thousand shares were not *issued* to Bodfish for the amount of the value of property necessary for the business of the corporation, within the meaning and intent of the act of 1853, amending the act of 1848; that the issue of the stock to Bodfish, and the subsequent transfer of it to the three associates and their subsequent transfer of twenty thousand shares of it to the defendants, were mere forms, gone through with, so as to make an excuse, or create a color for calling the dispositions of the twenty thousand shares by the defendants *sales,* and the parties who took them, or agreed to take them, and paid for them, *purchasers;* that these parties were, and must be regarded as *subscribers,* and not as *purchasers,* at the scheme price, and that the defendants were, and must be regarded as having been the agents of the sixteen associates to obtain *subscriptions* for the twenty thousand shares of stock, at the *scheme* price.

I have said that out of the amount paid over by the defendants, as the proceeds of the twenty thousand shares at

Butler *v.* Livermore.

the *scheme* price, $320,000, was paid back to or distributed among the sixteen associates; and it appears that $90,000 of the amount paid over by the defendants was retained and credited to the corporation as working capital, but the evidence does not enable me to say what was done with, or what has become of the rest of the amount so paid over by the defendants.

John A. Butler, one of the plaintiffs, on the 2d of April, 1864, agreed with the defendants to take five hundred of the twenty thousand shares at the scheme price, on his individual account, and put down his name, or had it put down, for that number of shares. On the 6th of April, when the twenty thousand shares had all been subscribed for, he agreed, for himself and his co-plaintiffs, with the defendants, to pay $5 a share more than the scheme price, to be permitted to take the place of a third party as a subscriber for the fifteen hundred shares, at the scheme price of $25 per share. The arrangement was made, and the plaintiff Butler, on the last mentioned day, subscribed for fifteen hundred shares at the scheme price, for himself and his co-plaintiffs.

The evidence in this case, Butler's own evidence, the heading of the subscription book, the undisputed circumstances of the transaction, convince me that when Butler agreed with the defendants to take the fifteen hundred shares, he knew, or at least supposed and believed, that he was dealing with the defendants as the agents of parties who had got up or were getting up a gold mining corporation, and who might perhaps, in the language of Wall street, be called "Hard Panners," and some of whom he heard named, that he knew, or at least supposed and believed, that he was dealing with the defendants, as the agents of these third parties, to obtain *subscriptions* for a certain number of the shares of the corporation, at the *scheme* price of half the nominal par value; that he did not suppose, or think, he was *purchasing* or agreeing to pur-

chase stock of the defendants, but that he supposed, or thought, he was subscribing for, or agreeing to take stock as a *subscriber* at the *scheme* price, a moiety of the nominal par value; that when he paid the defendants for the fifteen hundred shares, he supposed and believed he was paying the money to them as such agents, *for the use of their principals, and not for their own use.*

The defendants were in fact acting as such agents. They received the plaintiffs' money as such agents. They did not receive it nor was it paid to them as sellers of the fifteen hundred shares of stock for their own use, but it was received by them and paid to them as subscription agents for the use and benefit of their principals; and before this action was brought they had paid over the money to their principals, or to one of them, for the use of all, *without notice or objection.*

How then can I say that this action against the agents, as the only defendants, is sustained by the evidence, viewed either as an action at law or as a suit in equity?

As I have before substantially said, the cause of action stated in the complaint is against the defendants as sellers of the stock, to recover back the price alleged to have been paid for the stock, as stock of the defendants, for their use, disaffirming the alleged contract of sale, and not affirming the alleged contract of sale to recover damages for the alleged false and fraudulent representations.

When the cause of action alleged in the complaint is on contract, and the proof shows a cause of action for a tort, it is not a variance within sections 169, 170 of the Code, but a failure of proof, within section 171. (*Walter* v. *Bennett,* 16 *N. Y. Rep.* 250. *Ramson* v. *Wetmore,* 39 *Barb.* 106. *Mayor of New York* v. *Parker Vein Steamship Co.,* 21 *How.* 289. *Andrews* v. *Bond,* 16 *Barb.* 642. *Saltus* v. *Genin,* 3 *Bosw.* 262.)

It seems that a judge, at the trial, cannot strike out a pleading, or allegations in a pleading. (*Smith* v. *Country-*

*man* 30 *N. Y. Rep.* 668.) If, therefore, I should send the case to the circuit for trial, it could not be tried there as an action to recover damages for obtaining the plaintiffs' money for the use of the sixteen associates, or of the corporation, by means of the alleged false and fraudulent representations.

The result is, that I am forced to dismiss the complaint, for I do not think, on the case made by the proofs, I can, considering the pleadings, render a judgment in this action against the defendants, the agents, for the money which they received of the plaintiffs, it being an undisputed fact, that they had paid it over, long before this action was commenced, to their principals, or to one of them, for the use of all.

In *Hearsey* v. *Boyd,* (7 *John.* 182,) Spencer, J. says: "The law is, I believe, well settled that an action may be sustained against an agent, who has received money to which the principal has no right, if the agent has had notice not to pay it over; and in some cases the action has been sustained, where no notice was given, if it appears that the money has not actually been paid over."

In *Frye* v. *Lockwood,* (4 *Cowen,* 456,) Sutherland, J. says: "Where money is paid to an agent *for the purpose of being paid over to his principal,* no suit will lie against the agent to recover it back." (*See also Sadler* v. *Evans,* 4 *Burr.* 1984.) If the money is obtained by the agent illegally, by *compulsion or extortion,* it seems that an action will lie against the agent, though it has been paid over to his principal without notice, *unless the payment was made expressly for the use of the principal.* (*Ripley* v. *Gelston,* 9 *John.* 202. *Frye* v. *Lockwood, supra. Snowden* v. *Davis,* 1 *Taunt.* 359.)

Obtaining money by fraud or fraudulent misrepresentations cannot be called obtaining it by compulsion or extortion. Besides, I can not say that the evidence in the

case does not show that the money was paid to the defendants, as agents, expressly for the use of their principals.

I do not say that the plaintiffs, if they have been defrauded, have no remedy in a proper action, against the sixteen associates, or the corporation, or its trustees, or all; nay, possibly even a remedy in the name of the corporation. I do not mean to intimate that a fraud can be perpetrated, through or in the name of a skeleton corporation, organized under an improvident statute, in evasion of it, without the possibility of legal redress.

By any thing that has been said, I have not intended to intimate, if the plaintiffs were induced by the defendants to pay their money by false and frudulent representations, that an action would not lie against the defendants to recover damages for the fraud, or tort, though the plaintiffs paid the money to the defendants, expressly for the use of their principals, and though it had been paid over without notice, and whether the defendants were, or were not, authorized by their principals to make the representations.

Nor have I intended to express any opinion on the question whether Butler did or did not subscribe for the 1500 shares, under circumstances, and with a knowledge of circumstances, and of New York bubble corporations, which should reasonably have apprised him of the purpose with which the corporation was got up, and the defendants employed, to obtain *subscriptions* for 20,000 shares of the stock, at a *scheme* price of $25 a share, the printed prospectus of the company, which he says he saw, having on its face, in plain print, these figures and words:

" 50,000 shares. Nominal par $50 each, issued for the purpose of the purchase of their property in Colorado."

. I do not pass upon the issues and evidence in this case, relating to the alleged fraudulent misrepresentations,

because, in my view of the issues and evidence in the action, I could not give the plaintiffs a judgment in it, though I should find, as to that part of the case, favorably to the plaintiffs.

There must be judgment for the defendants, dismissing the complaint, but under the circumstances, *without costs.*

[New York Special Term, April 6, 1868. *Sutherland*, Justice.]